UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


INDIRA GRADASCEVIC,

     Plaintiff,                         Civil Action No. 16-12998

v.                                 HON. MATTHEW F. LEITMAN
                                 U.S. District Judge
                                 HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Indira Gradascevic ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On April 1 and 18, 2013 respectively, Plaintiff filed applications for DIB and SSI, alleging disability as of March 24, 2010 (Tr. 146-147, 155-161). After the initial denial of

the claim, Plaintiff requested an administrative hearing, held on November 12, 2014 in Oak Park, Michigan before Administrative Law Judge ("ALJ") Timothy C. Scallen (Tr. 30). Plaintiff, represented by attorney Lisa Welton, testified (Tr. 33-50), as did Plaintiff's husband, Vahidin Gradascevic (Tr. 51-55). On May 13, 2015, ALJ Scallen found that Plaintiff was capable of performing her past relevant work (Tr. 22-24). On June 23, 2016, the Appeals Council denied review (Tr. 1-6). Plaintiff filed for judicial review of the final decision on August 17, 2016.

## BACKGROUND FACTS

Plaintiff, born June 7, 1970, was 44 when the ALJ issued his decision (Tr. 24, 146). She completed high school[1] and worked previously as a nursing home housekeeper (Tr. 173). She alleges disability due to left hand problems, depression, and nerve damage to the back and neck (Tr. 172).

### A.      Plaintiff's Testimony[2]

Plaintiff offered the following testimony through a Bosnian interpreter.

She lived in the United States for the past 10 years (Tr. 34). After emigrating, she worked as a housekeeper until experiencing arm problems and headaches after multiple left wrist surgeries (Tr. 35). Following the onset of the arm problems, she experienced

---

[1]However, she testified that she left school after the equivalent of eight grade (Tr. 34).

[2]In summarizing Plaintiff's testimony, I have included her contradictory statements, *i.e.,* she did not currently experience medication side effects (Tr. 38) versus her claim that she was required to sleep most of the day due to "the medicine" (Tr. 50).

psychological problems characterized by nervousness and irritability (Tr. 35). Her arm continued to hurt (Tr. 35). She was primarily disabled due to left hand and wrist pain radiating to her neck (Tr. 36). Pain medication partially relieved the left upper extremity pain (Tr. 37-38). Her initially prescribed medication caused the side effect of numbness but she did not experience side effects since a medication change (Tr. 38). On a one-to-ten scale, she typically experienced level "nine" pain and level "ten" pain during weather changes (Tr. 37).

Aside from the physical problems, Plaintiff experienced concentrational problems when she became "stressed out" (Tr. 38). Her anxiety stemmed from the failure of a second wrist surgery[3] and the need for various medications (Tr. 39). The anxiety was characterized by sleep disturbances and sweating (Tr. 39). She coped with anxiety by taking medication and then reclining undisturbed (Tr. 39).

Plaintiff was unable to pick up even a spoon with the left hand without experiencing pain (Tr. 40). She was able to use her right hand, but experienced shoulder pain when she overworked the right side (Tr. 40). She was able to sit for an entire day but was limited to standing for no more than 30 minutes (Tr. 41). She did not experience problems walking except for dizziness (Tr. 42). She experienced a limited range of neck motion (Tr. 42).

_____

[3]The medical transcript references the second surgery but does not contain surgical records from the second surgery.

Plaintiff could not remember how tall she was and had not weighed herself in a long time (Tr. 44). She and her family lived in the upper story of an apartment building, requiring her to climb stairs to reach her unit (Tr. 44). She was unable to perform any stooping, kneeling, crouching, or crawling (Tr. 45). She did not experience range of motion limitations in the right upper extremity (Tr. 45). She was unable to either open or close the left hand (Tr. 46). Her left-sided limitations increased gradually after her second surgery (Tr. 47).

Plaintiff required help bathing and getting dressed and was unable to do dishes or laundry chores (Tr. 47). She had not driven since 2010 and was accompanied by her husband when she left home (Tr. 48). She experienced anxiety in crowds and with strangers (Tr. 49). She experienced more "bad" than "good" days, noting that on "bad" days, she self-isolated and experienced crying jags (Tr. 48). She experienced good family support but no longer had friends due to her mood changes (Tr. 48). On a "good" day, she watched television and talked to her children (Tr. 49). Even on good days, she experienced problems understanding television shows (Tr. 49). Due to the side effect of pain medication, she was required to recline or sleep for most of the day (Tr. 50).

**B. Testimony of Plaintiff's Husband**

Plaintiff's husband, Vahidin Gradascevic, testified that his wife slept only four hours a night but slept between two and four hours during each day (Tr. 51-52). He reported that at most, she performed a "few" household chores (Tr. 52). He helped her wash her hair and

bathe (Tr. 52). He noted that Plaintiff's intermittent depression was characterized by quietness and the desire to be alone (Tr. 52). He recently found her wandering around a mile from their home (Tr. 52). She experienced concentrational problems resulting in her forgetting to take a tea kettle off the stove (Tr. 53). Plaintiff's husband worked in their apartment building, allowing him to check on her on an hourly basis to make sure she did not set something on fire or leave the water running (Tr. 53). He reported that Plaintiff had attempted to drive after the surgery but ran a red light and then vomited (Tr. 54). Plaintiff's husband opined that his wife was unable to drive due to anxiety (Tr. 54).

### C. Medical Evidence

#### 1. Treating Sources

November, 2008 surgical records predating the alleged onset of disability note that the excision of a synovia cyst of the left wrist was performed without complications (Tr. 390-391). In April, 2010, Jeff M. Hall, M.D. found that Plaintiff could return to work as of April 23, 2010 limited to "no use of the left arm" (Tr. 337).

An April, 2010 MRI of the left wrist was positive for a small synovia or ganglion cyst with a "partial tear" of the fibrocartilage (Tr. 349, 351). In August, 2010, Plaintiff sought emergency treatment for chest wall pain and vomiting (Tr. 412). Plaintiff demonstrated 5/5 grip strength and could move "all four extremities spontaneously and equal[ly] without difficulty" (Tr. 413). A neurological examination was unremarkable (Tr. 413). In September and October, 2010, Seid Cosovic, M.D. administered neuromodulation treatment

(infrared lasers) (Tr. 317-325). A November, 2010 bone scan of the bilateral hands and wrists was unremarkable (Tr. 348). In December, 2010, Joseph P. Femminineo, M.D. noted "some red flags regarding [medication] compliance issues" (Tr. 394). He observed "good healing" and no atrophy but "a rather significant Tinel sign over the radial nerve on the left and to a lesser degree the median nerve at the carpal tunnel (Tr. 344). Motor testing was otherwise normal (Tr. 344). He found that Plaintiff was able to return to work "with right-handed activity only" (Tr. 344). He recommended "aggressive" physical therapy (Tr. 344, 394). The same month, Plaintiff sought emergency treatment for nausea (Tr. 410). Emergency room records note normal muscle tone in all extremities and "appropriate behavior and judgment" (Tr. 411). A January, 2011 MRI of the cervical spine showed mild encroachment at C5-C6 but was otherwise unremarkable except for mild disc bulging at C3-C4 and C4-C5 (Tr. 339, 362). The same month, Dr. Femminineo noted "complex regional pain syndrome" and "significant anxiety" (Tr. 357, 393-394). He noted that Plaintiff had been non-compliant with recommendations for physical therapy (Tr. 393). He found that Plaintiff should remain off work and "due to anxiety factor," Plaintiff was unable to drive (Tr. 357, 393). He prescribed Xanax (Tr. 358). In March, 2011, Dr. Femminineo recommended acupuncture and found that Plaintiff should be off work for another six weeks (Tr. 342, 359). His treating records note "some clinical improvement" including that swelling and inflamation had dissipated (Tr. 392). He referred Plaintiff for a psychiatric consultation, observing "significant psychologic overlay" in addition to the wrist condition

(Tr. 392). The same month, a cardiac stress test yielded unremarkable results (Tr. 356). Dr. Cosovic found that Plaintiff was on a "medical disability" (Tr. 316). He prescribed Klonopin and Celexa and began a series of neuromodulation treatments (Tr. 251-300, 302, 304, 306, 308, 310-312, 315).

In April, 2011, hand surgeon B. J. Page, II, D.O. examined Plaintiff, noting her complaints of worsening hand and wrist pain and her complaint that the laser treatments did not help her condition (Tr. 397). A neurological examination was unremarkable, but Plaintiff exhibited a reduced range of left shoulder movement (Tr. 398). Noting Plaintiff's treatment history, he diagnosed Plaintiff with "reflex sympathetic dystrophy," adding that he believed that the laser treatment should be discontinued (Tr. 400). He recommended nerve blocks, biofeedback, psychological evaluation, and "possible consideration for sympathectomy if standard methods do not help her" (Tr. 401). He opined that Plaintiff was able to work "in a one-handed capacity" (Tr. 401). In September, 2011, Dr. Cosovic found that Plaintiff was unable to work as of March, 2010 and required household services due to upper extremity problems, anxiety, and depression (Tr. 353-355).

May, 2011 intake records by psychiatrist Marietta Jamsek-Tehlirian, M.D. note Plaintiff's report of anxiety following a June, 2010 hand operation (Tr. 402). The anxiety was characterized by heart palpitations, feelings of helplessness, irritability, memory loss, and concentrational problems leading her to drive in the wrong direction in traffic (Tr. 402). She reported smoking two packs of cigarettes each day (Tr. 402). Dr. Jamsek-Tehlirian

diagnosed her with anxiety disorder with panic attacks and depression resulting from arm problems, assigning her a GAF of 45[4] (Tr. 404). Dr. Jamsek-Tehlirian found that Plaintiff was unable to drive and required psychotropic treatment and medication (Tr. 404). August, 2011 psychiatric treating records note unchanged symptoms of depression and sleep disturbance (Tr. 406).

January, 2012 treating records by Dr. Jamsek-Tehlirian note Plaintiff's report of sleep disturbances (Tr. 250, 376). Records from later the same month state that the sleep disturbances were resolved with medication (Tr. 250, 376). March, 2012 records state that the symptoms of nausea improved after Plaintiff stopped taking Prozac (Tr. 249, 375). Dr. Jamsek-Tehlirian's notes from the following month state that Plaintiff's financial problems created anxiety and that Plaintiff was "crying every day" (Tr. 248). May, 2012 records note that Plaintiff's depression was lifting but that she had memory problems (Tr. 247). Dr. Jamsek-Tehlirian's July, 2012 records state that Plaintiff's mood problems were exacerbated by shoulder pain (Tr. 246, 372). Dr. Jamsek-Tehlirian's March, 2013 records note increased shoulder pain due to weather changes, depression, and a loss of appetite (Tr. 243, 367, 369). The same month and in April, August, September, and November, 2013, Plaintiff underwent additional neuromodulation treatment (Tr. 364-365, ).

---

[4] A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000) ("*DSM-IV-TR*"), 34.

In November, 2013 Dr. Jamsek-Tehlirian completed an assessment of Plaintiff's psychologically-related work limitations, noting the symptoms of worthlessness, depression, anxiety, irritability, isolation, insomnia, memory problems, and headaches[5] (Tr. 415). Dr. Jamsek-Tehlirian found that due to depression and anxiety, Plaintiff experienced marked limitation in daily living, social functioning, and concentration, persistence, or pace with the inability to live outside a "highly supportive" environment for one or more years (Tr. 416-417). She found that Plaintiff experienced either marked or extreme limitation in psychological functioning except for "slight" limitations in grooming and hygiene (Tr. 417-418).

In June, 2014, Dr. Cosovic found that Plaintiff experienced "extreme" upper left extremity pain and anxiety (Tr. 419). He assigned her a "poor" prognosis (Tr. 419). He found that she was unable to stand for more than 45 minutes at a time or sit for more than 30 due to pain (Tr. 420). He found that Plaintiff was unable to lift more than five pounds at a time (Tr. 420). He found that she experienced "extreme" limitation in manipulative functions and moderate limitation in all postural functions (Tr. 420). He found that her ability to work was also limited by the environmental limitations of heights, stairs, moving machinery, fumes, gases, humidity, temperature extremes, chemicals, noise, and vibration

---

[5]The November, 2013 assessment indicates Dr. Jamsek-Tehlirian's name had been changed to "Jamsek-Rolnick" prior to the assessment. For the sake of clarity, she will be referred to by her former name although the records from this point forward reflect the name change.

(Tr. 420).  He found that Plaintiff's physical conditions were exacerbated by fatigue, heat, stress, and a static position (Tr. 421).  He found extreme concentrational impairments and that the impairments would require Plaintiff to be absent from work "five times a month or more" (Tr. 421).  His treating records from the same month indicate that he continued to administer neuromodulator treatment (Tr. 436).

Dr. Jamsek-Tehlirian's February, 2014 records note an increased dosage of Paxil and other psychotropic medication (Tr. 428).  Dr. Jamsek-Tehlirian's September, 2014 records state that Plaintiff was more depressed, anxious, tense, and overwhelmed since a June, 2014 medication change (Tr. 423).  The following month, Dr. Jamsek-Tehlirian completed a "Disability Assessment," finding that Plaintiff experienced "severe" memory problems but only "mild" problems in standing or sitting (Tr. 441).  She found that Plaintiff experienced moderate difficulty walking a long distance or staying alone for a few days (Tr. 441).  She found severe limitation in activities of daily living and social functioning (Tr. 442-443).

## 2.  Non-Treating Sources

In August, 2013, Julia A. Czarnecki, M.A., working under the guidance of Nick Boneff, Ph.D., performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of disabling hand and neck pain and depression (Tr. 377).  Plaintiff reported that her activities were limited to sleeping, taking medication, and visiting with her mother (Tr. 378).  Czarnecki noting that Plaintiff was well dressed and groomed, did not appear to be in distress, was a good historian, and did not require a translator (Tr. 378).

However, Czarnecki noted that when Plaintiff was asked "simple questions" as part of the mental status examination, she expressed difficulty (Tr. 378). Czarnecki concluded that Plaintiff "was exaggerating and putting forth an insincere effort" and was "intentionally uncooperative and malingering" (Tr. 378-379). She assigned Plaintiff a GAF of 60[6] (Tr. 379).

The same day, Ernesto Bedia, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of left upper extremity pain radiating from her left shoulder to the hand (Tr. 382). Dr. Bedia noted that Plaintiff was fully oriented with a normal gait (Tr. 383-384). He observed "some" neck spasm and tenderness with limitation of movement and left shoulder range of motion limitations (Tr. 384, 387). He observed intact "fine and gross movements" and the ability to pick up a coin (Tr. 384-385). A neurological examination was unremarkable (Tr. 385).

Later the same month, Ashok Kaul, M.D. performed a non-examining review of the treating records on behalf of the SSA, finding that Plaintiff's psychological impairments were non-severe (Tr. 60-61). The same day, R. H. Digby, M.D. performed a non-examining review of the medical records pertaining to Plaintiff's physical problems, finding that she was capable of lifting or carrying up to 50 pounds occasionally and 25 frequently and sitting, standing, or walking for around six hours in an eight-hour workday (Tr. 62). He found that

---

[6]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

Plaintiff was capable of frequent balancing, stooping, kneeling, crouching and climbing of ramps/stairs and occasional crawling and climbing of ropes, ladders, or scaffolds (Tr. 63). He limited Plaintiff to occasional bilateral overhead tasks and frequent left-sided handling (Tr. 63). He found that Plaintiff should avoid even moderate exposure to hazards such as machinery and heights (Tr. 64).

### 3.  Material Submitted Subsequent to the ALJ's May 13, 2015 Determination[7]

---

[7]

The records were submitted subsequent to the administrative decision of May 13, 2015. In contrast to the evidence considered by the ALJ, the Court cannot consider the newer records in determining whether Plaintiff is entitled to a remand for benefits. The sixth sentence of 42 U.S.C. § 405(g), pertaining to evidence submitted after the administrative decision, states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..."

Dr. Cosovic's June, 2015 assessment does not provide grounds for a "Sentence Six" remand for further fact-finding. To satisfy the "materiality" requirement for a "Sentence Six" remand, a claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence" *Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 711 (6th Cir. 1988). The June, 2015 records are not likely to change the ALJ's finding of non-disability. Dr. Cosovic's June, 2015 findings reflect a lesser degree of limitation than the records reviewed before the ALJ. In contrast to his June, 2014 findings, Dr. Cosovic found that Plaintiff could sit up to 45 minutes rather than 30 and lift up to 10 pounds in contrast to his previous finding of only five pounds (Tr. 420, 461). His finding of a lesser degree of limitation is not likely to sway the ALJ where the more stringent limitations did not.

Further, Plaintiff has not provided "good cause" for the tardy submission made one month after the ALJ issued his decision. While it is unclear whether counsel deliberately submitted the newer records to "sandbag" the ALJ's non-disability finding, post-decision evidence created for the purpose of "rebutting" an ALJ's decision does not satisfy the "good cause" requirement of § 405(g). *Haney v. Astrue*, 2009 WL 700057, *6 (W.D. Ky. March 13, 2009)(*citing Thomas v. Secretary*, 928 F.2d 255, 260 (8th Cir., 1991)); *See also Ledford v. Astrue*, 311 Fed.Appx. 746, 757, 2008 WL 5351015, *10 (6th Cir. December 19, 2008) (*citing Martin v. CSS*, 170 Fed.Appx. 369, 374-75, 2006 WL 509293 *5 (6th Cir. March 1,

In June, 2015, Dr. Cosovic completed a second questionnaire, noting a poor prognosis due to left upper extremity pain stemming from Reflex Sympathetic Dystrophy with cervical disc displacement at C5-C6 (Tr. 460). He found the side effects of drowsiness and fatigue (Tr. 460). He found that Plaintiff needed to recline for two hours a day and was incapable of standing for more than four hours due to pain and unable to sit more than 45 minutes (Tr. 461). He found that she was limited to lifting 10 pounds occasionally and five pounds frequently (Tr. 461). He found marked limitations in manipulative activities and slight limitation in postural activities (Tr. 461). He found that the condition was exacerbated by changing weather, stress, fatigue, muscle overuse, humidity, and remaining in one position (Tr. 462). He found marked to extreme concentrational limitation due to pain and fatigue and found that Plaintiff would be likely to miss work five times a month or more (Tr. 462). He found that the environmental factors of heights, moving machinery, fumes, gases, humidity, temperature extremes, and vibration would affect Plaintiff's work performance (Tr. 461).

### B. Vocational Findings

On November 17, 2014, Vocational Expert ("VE") James M. Fuller answered an interrogatory, considering a hypothetical individual of Plaintiff's age, education, and work background limited to medium[8] work with "frequent climbing of stairs and ramps;"

—————————————

2006)).

[8]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small

"occasional climbing of ropes, ladders and scaffolds; frequent balancing, stooping, kneeling and crouching;" "only occasional crawling [and] occasional reaching overhead bilaterally; frequent reaching, handling and fingering with the left non-dominant upper extremity; frequent flexion, extension and rotation of the neck;" with less than "moderate exposure to unprotected heights and moving machinery;" with "no work on uneven, slippery or shifting terrain;" and limited to "simple, routine, repetitive tasks" (Tr. 232).

In response, the VE stated that the individual could perform Plaintiff's past relevant work as a "housekeeping/cleaner" (Tr. 231) as well as the medium, unskilled work of a dishwasher, packer, or laundry worker (Tr. 233).

### E. The ALJ's Decision

Citing Plaintiff's treating records, ALJ Scallen found that Plaintiff experienced the severe impairments of "depressive disorder; anxiety disorder; and chronic regional pain syndrome/reflex sympathetic dystrophy syndrome (left upper extremity) with a history of recurrent ganglion cyst (left wrist)," but that none of the impairments met or equaled a listed impairment under 20 CF.R. Part 404, Subpart P, Appendix 1 (Tr. 16-17). The ALJ found that Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, and pace (Tr. 17). He found that

---

tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally medium work with the following additional limitations:

> [F]requent climbing of stairs and ramps but only occasional climbing of ropes, ladders and scaffolds; frequent balancing, stooping, kneeling, and crouching but only occasional crawling; occasional reaching overhead bilaterally; frequent reaching, handing and fingering with the left non-dominant upper extremity; frequent flexion, extension and rotation of the neck; avoid even moderate exposure to unprotected heights and moving machinery; no work on uneven, slippery or shifting terrain; simple, routine, repetitive tasks (Tr. 18).

Citing the VE's interrogatory responses, the ALJ found that the above limitations would allow Plaintiff to perform her past relevant work as a housekeeper/cleaner as well as the unskilled, medium work of a dishwasher, packer, or laundry worker (Tr. 23, 232-233).

The ALJ discounted Plaintiff's allegations of limitation, noting that a field officer conducting an initial interview noted no physical limitations or concentrational difficulties during the 90-minute interview (Tr. 19). The ALJ cited the field officer's observation that Plaintiff did not use a left wrist brace, was able to retrieve items from her purse, and was able to answer most of the questions in English without help from her husband (Tr. 19). The ALJ cited the consultative psychological examiner's report showing that Plaintiff was able to communicate in English and (consistent with the field officer's conclusion) appeared to be "malingering" (Tr. 20). The ALJ noted that as of December, 2010, Plaintiff demonstrated normal muscle tone and a normal range of motion (Tr. 21).

**STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

**FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes four arguments remand. First, she contends that the conditions of depression and anxiety meet the SSA's criteria for disability. *Plaintiff's Brief,* 26-27, *Docket #14,* Pg ID 556. Second, she argues that the ALJ erred by failing to consider the effect of Reflex Sympathetic Dystrophy Syndrome ("RSDS") in analyzing the conditions of depression and anxiety. *Id.* at 27-29. Third, she faults the ALJ for adopting the consultative and non-examining medical opinions over the opinion of the treating physicians. *Id.* at 29-31. Finally, she argues that the ALJ's credibility determination did not take into account that the condition of RSDS caused pain "out of proportion to the underlying pathology." *Id.* at 32-36.

Because the question of whether the ALJ mis-analyzed the condition of RSDS in assessing Plaintiff's mental and physical limitations is partially dispositive of the other arguments, the Court will consider Plaintiff's second argument first, followed by the arguments regarding the relative weight accorded the non-treating sources (argument 3), the credibility determination (argument 4), and finally, whether the conditions of anxiety and depression met a listed impairment (argument 1).

## A. SSR 03-2p (Argument 2)

### 1. Basic Principles

SSR 03-2p pertains to the evaluation of RSDS, also known as Complex Regional Pain Syndrome ("CRPS"). Under the Ruling, the condition is defined as "a chronic pain syndrome most often resulting from trauma to a single extremity." 2003 WL 22399117, *1 (October 20, 2003). In RSDS/CRPS, "the degree of pain reported is out of proportion to the severity of the injury sustained by the individual." *Id.* The condition may be characterized by "complaints of muscle pain," stiffness, "restricted mobility, or abnormal hair and nail growth in the affected region." Signs of "autonomic instability" including "changes in the color or temperature of the skin," "frequent appearance of goose bumps," and osteoporosis. *Id.* at *2. "[T]he documentation of medical signs or laboratory findings at some point in time in the clinical record since the date of the precipitating injury is critical in establishing the presence of a medically determinable impairment." *Id.* at *4.

At Step Three, "[p]sychological manifestations related to RSDS/CRPS should be

evaluated under the mental disorders listings, and consideration should be given as to whether the individual's impairment(s) meets or equals the severity of a mental listing." SSR 03-2p at *6. "Opinions from an individual's medical sources, especially treating sources, concerning the effect(s) of RSDS/CRPS on the individual's ability to function in a sustained manner in performing work activities, or in performing activities of daily living, are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC." *Id.* at *7.

However, the mere finding that the condition is an MDI and a severe impairment does not establish disability. SSR 03-2p directs that in determining whether the condition(s) creates disability level limitation, the ALJ must also analyze the record pursuant to SSR 96-7p, 1996 WL 362209 (July 2, 1996).[9] *Id.* at *6, 8. The applicable prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."*Id.* [10] *See Roach v.CSS*, 2016 WL 4150650, *4–5 (W.D. Mich. August 5,

---

[9]More commonly, the SSR 96-7p analysis is currently used in making credibility determinations.

[10]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in addressing the second prong of SSR 96-7p:

 (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other

2016)(citing SSR 03-2p)(despite diagnosis of RSDS, ALJ did not err in concluding that other evidence undermined claimant's allegation that the condition was disabling).

## 2. The Present Case

As an initial matter, the fact that ALJ Scallen did not cite SSR 03-2p is not fatal to his analysis of RSDS/CRPS. An ALJ's failure cite SSR 03-2p does not constitute reversible error provided "no substantial rights were affected by [the] oversight." *Johnson v. Astrue*, 2012 WL 3527972, at *9 (S.D.Tex. August 14, 2012)(*citing Hall v. Schweiker*, 660 F.2d 116, 119 fn. 4 (5th Cir. September 9, 1981)(per curiam)(remand not warranted for failure to cite SSR 03-2p where after finding that RSDS was a severe impairment, "ALJ applied SSR 96–7p in evaluating Johnson's symptoms, and both SSR 03–2p and SSR 96–7p apply the same standards").

ALJ Scallen's analysis is consistent with the requirements of SSR 03-02p. First, he acknowledged that the condition was an MDI, finding at Step Two that RSDS/CRPS was a severe impairment (Tr. 16). Then, the ALJ applied SSR 96-7p in "evaluating the entire case record" to determine whether the symptoms of RSDS/CRPS caused disabling limitations (Tr. 18). He cited an SSA field officer's observation that Plaintiff did not experience

---

than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

concentrational problems, did not require the use of a wrist brace, and did not demonstrate any problems using her hands, writing, or limitations in understanding for the duration of the entire interview (Tr. 19, 183-184). He noted that Plaintiff's good understanding of English contradicted her claims that she required an interpreter (Tr. 19, 183-184). The ALJ noted that Plaintiff's claim that she was unable to pick up even a spoon with the left hand stood at odds with the officer's observation that she was able to retrieve items from her purse without difficulty (Tr. 19, 183-184).

The ALJ noted that the objective evidence further undermined Plaintiff's claim of disabling left upper extremity limitations. He noted that an April, 2010 MRI of the left wrist showed only mild abnormalities and that a November, 2010 bone scan of the bilateral wrists and hands was normal (Tr. 20). While the condition of RSDS/CRPS is generally characterized by pain disproportionate to the objective findings, osteoporosis is one of the few objectively verifiable characteristics of RSDS/CRPS. *See* SSR 03-2p at *2. Accordingly, the normal bone scan undermines the claims of disability resulting from the condition.

The ALJ also noted that Plaintiff's claims were contradicted by Dr. Bedia's consultative records showing "that save for some neck and left shoulder range of motion limitations," the exam was otherwise normal (Tr. 20). He noted that Dr. Bedia's finding that Plaintiff was able to perform fine and gross movements and did not demonstrate "swelling or tenderness" in either hand stood at odds with Plaintiff's claim that she was wholly unable

to use her left upper extremity (Tr. 21). The ALJ cited 2010 emergency room records for treatment for conditions unrelated to RSDS/CRPS showing "5/5 grip strength and intact sensation" in all extremities, normal muscle tone, no joint swelling, and normal neck motion (Tr. 21 citing 410-412). Contrary to Plaintiff's allegation that she had no practical use of her left arm, the ALJ observed that none of the treating or consultative records noted atrophy or symmetry (Tr. 21). He cited Dr. Feminineo's December, 2010 records noting "'red flags regarding compliance issues'" (Tr. 21 *citing* 394).

The ALJ also considered the effects of RSDS/CRPS on her psychological functioning. Aside from his citation to the field officer's interview and emergency room records showing no upper extremity limitations, the ALJ noted that Plaintiff's claim of disabling psychological limitation was undermined by her "intentionally uncooperative" behavior at the consultative psychological examination (Tr. 21 *citing* 378-379). He cited the examination notes stating that Plaintiff was well-dressed and well-groomed, "was not in any physical distress," and was a "good historian" (Tr. 22). In contrast, he noted that "'upon initiation of the mental status questions, Plaintiff "'rather suddenly had difficulty answering the simplest of questions such as counting to ten . . .'" and professed difficulty adding and subtracting single digits (Tr. 21-22 *citing* 378-379). The ALJ's findings are consistent with my own review of the same records showing that Plaintiff "made no mention of memory problems [or] cognitive impairments prior to the mental status questioning and it is this examiner's opinion, the patient was exaggerating for secondary gain" (Tr. 378). The

consultative examiner noted the absence of "any significant psychiatric symptoms," and as the ALJ noted, "a strong suggestion" of "malingering" (Tr. 21, 379). As discussed further below, the ALJ rejected the treating opinions of either physical or psychological disability on the basis that the opinions were based "quite heavily on the subjective report of symptoms and limitations" provided by Plaintiff (Tr. 22). Likewise, as discussed below, the ALJ built a logical bridge between the evidence of record and the limitations found in the RFC.

Because the ALJ provided an adequate rationale for finding that RSDS/CRPS did not cause greater limitation than found in the RFC, much less disabling limitations, a remand this basis is not warranted.

### B. The Treating, Examining, and Non-Examining Sources (Argument 3)

For overlapping reasons, the ALJ did not err in rejecting the treating source opinions in favor of the consultative (examining) and non-examining findings.

"The Social Security regulations classify 'acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources.'" *Brooks v. CSS*, 531 Fed.Appx. 636, 641 (August 6, 2013)(*citing Smith v. CSS*, 482 F.3d 873, 875 (6th Cir.2007)). "[A] nonexamining source's opinion is given less deference than an examining (but not treating) source's opinion, which is given less deference than a treating source." *Id.* at 642 (*citing Norris v. CSS*, 461 Fed.Appx. 433, 439 (6th Cir.2012)). However, "'[i]n appropriate circumstances, opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating or examining

sources." *Id.* (*citing* SSR 96–6p, 1996 WL 374180, *3 (July 2, 1996).

As a preliminary matter, the ALJ did not rely exclusively on the non-treating findings in crafting the RFC. The ALJ rejected Dr. Kaul's non-examining conclusion that Plaintiff experienced no level of psychological limitation in favor of the finding that she had moderate limitation in concentration, persistence, or pace (Tr. 17). However, the ALJ did not err in rejecting the gist of the treating opinions by Drs. Feminineo, Cosovic and Jamsek-Tehlirian on the basis that they "simply regurgitate [Plaintiff's] subjective complaints" (Tr. 21). He noted that the Dr. Feminineo's opinion that Plaintiff was capable of only "right-handed" activity (Tr. 344) was contradicted by his own treating notes showing the absence of atrophy and emergency treatment records showing full grip strength and normal muscle tone in all extremities (Tr. 411, 413). The ALJ noted that none of Dr. Cosovic's opinions of extreme exertional and postural limitations were corroborated with clinical or objective observations. My own review of the records, *see above,* show that Dr. Cosovic's treatment records are limited almost exclusively to ongoing neuromodulation treatments without comment as to whether the treatment actually improved her condition.

Moreover, the ALJ did not err in relying on Dr. Bedia's consultative findings which included modest neck and shoulder limitations but the ability to perform ""fine and gross movements" and an intact neurological functioning (Tr. 384-385). Plaintiff argues in passing that Dr. Digby's August, 2013 non-examining finding that she could perform a range of medium work did not have benefit of Dr. Cosovic's June, 2013 disability opinion. However,

the treating records created between the non-examining review and the June, 2014 treating opinion do not include clinical testing or observations likely to change Dr. Digby's August, 2013 conclusions. Likewise, while in November, 2013, Dr. Jamsek-Tehlirian found that Plaintiff's experienced "extreme" psychological limitation consistent with the need for inpatient or institutional care, she continued to treat Plaintiff exclusively with talk therapy and psychotropic medication (Tr. 415-417). The records created subsequent to the August, 2013 consultative psychological examination show that Plaintiff continued to receive almost exactly the same treatment.

Finally, I note that Drs. Cosovic's and Jamsek-Tehlirian's opinions are inconsistent with each other as well as Plaintiff's testimony. While Plaintiff testified that she was capable of unlimited sitting and the could use the upper right extremity so long as she did not "overwork" it (Tr. 40-41), and Dr. Jamsek-Tehlirian found that Plaintiff experienced only "mild" limitations in standing or sitting (Tr. 441), Dr. Cosovic found that she was incapable of sitting for more than 30 minutes and was unable to lift more than five pounds (Tr. 420). Likewise, Dr. Jamsek-Tehlirian's finding that Plaintiff experienced only "slight" limitations in grooming and hygiene (Tr. 417-418) stands at odds with Plaintiff's claim that she was unable to bath or dress by herself (Tr. 47).

Because the ALJ's rejection of the treating source opinions in favor of the consultative sources and Dr. Digby's non-examining findings are well supported by the record, a remand on this basis is not warranted.

### C. The Credibility Determination (Argument 4)

For the same reasons as discussed in Section A of the analysis, the ALJ did not err in rejecting Plaintiff's allegations of disabling physical and mental limitation. While Plaintiff reiterates that pain experienced as a result of RSDS/CRPS is intrinsically disproportionate to the physical findings, the ALJ found that the record as a whole pointed to the conclusion that she exaggerated her level of physical limitation. Substantial evidence supports his findings. He noted that Plaintiff's testimony that she was unable to lift even a spoon with the left hand was contradicted by the field officer's observation that she was able to retrieve items from her purse without difficulty (Tr. 19, 40, 183-184).

While Plaintiff also argues that she experienced the medication side effect of drowsiness, the ALJ cited the consultative examination and emergency room records showing normal concentrational abilities and judgment (Tr. 19-20, 411, 413, 378, 383-384). Plaintiff argues that the emergency room treatment did not include a full-blown psychological examination and that the transient symptoms of RSDS/CRPS might not have been present during the emergency treatment. However, the unremarkable emergency room records are consistent with the field officer's observations and the consultative examinations in which Plaintiff's alleged psychological and physical limitations were also absent. Notably, none of the treating or examining records showed atrophy of the left upper extremity, which would be expected if she were indeed unable to hold even a spoon.

Plaintiff also argues that language barriers, rather than malingering, were responsible for her inability to perform well on the mental status evaluation. However, the ALJ's finding that she was capable of understanding and speaking English is supported by both the field officer's observations and Plaintiff's ability to provide a cogent history without the help of a translator at the consultative examination. The field officer's observation that Plaintiff exaggerated both her physical and language limitations further supports the ALJ's rejection of her claims of extreme physical and emotional impairment.

Because the credibility determination is generously supported by the record, a remand on this basis is not warranted. *See Cruse v. CSS*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination entitled to deference)(It is well established that "an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' " *Cruse v. CSS*, 502 F.3d 532, 542 (6th Cir. 2007) (*citing Walters v. CSS,* 127 F.3d 525, 531 (6th Cir. 1997)); (*Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989))(*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

**D. The Listed Impairments (Argument 1)**

Plaintiff also disputes the finding of only mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace. *Plaintiff's Brief* at 26-27. She argues, in effect, that the ALJ erred by failing to adopt Dr.

Jamsek-Tehlirian's of mostly marked and extreme psychological limitation. *Id.*

Plaintiff is correct that at Step Three of the sequential analysis, a finding of two marked limitation in the three categories of daily living and social functioning and moderate limitation in concentration, persistence, or pace resulting from the conditions of either depression or anxiety would result in a finding of disability. See 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.04(B), 12.06(B). Likewise, the applicable section of Listing 12.04(C) states that a finding of a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement" as a result of depression would also result in a disability finding. *Id.,* § 12.04(C). Dr. Jamsek-Tehlirian's findings of marked and extreme psychological limitation as well her finding that Plaintiff required a "highly supportive living arrangement," if credited, would direct a finding of disability under either Listing 12.04 or 12.06 (Tr. 416-417, 441-443).

However, as discussed above, the ALJ permissibly dismissed the treating psychiatrist's findings on the basis that the consultative records showed a significantly lessened degree of psychological limitation. Dr. Kaul's non-examining assessment actually supports the finding that Plaintiff had not made a case for *any* degree of psychological limitation. The ALJ permissibly adopted the "middle ground" by adopting the consultative psychologist's finding that while Plaintiff exaggerated her degree of psychological limitation, the record supported a finding of moderate concentrational limitation (Tr. 17). Accordingly, the ALJ's finding that Plaintiff's moderate degree of concentrational limitations would not

preclude "simple, routine, and repetitive tasks" as found in the RFC is supported by substantial evidence (18).

In closing, my recommendation to uphold the administrative findings should not be read to trivialize Plaintiff's physical limitations, depression, and anxiety to the extent that her claims are supported by the record. Nonetheless, the ALJ's determination that she was capable of a significant range of unskilled medium work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d

390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 31, 2017

## CERTIFICATE OF SERVICE

I hereby certify on July 31, 2017, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on July 31, 2017.

s/Carolyn Ciesla
Case Manager to
Magistrate Judge R. Steven Whalen